UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Michael Shawn McCourt,

    Plaintiff,

 vs.

R. Rios, Warden; J. Anderson,
Medical Administrator; Dr. J.
Dey, Past Clinical Director;
K. Peterson, Physicians
Assistant; C. Mead, E.M.T.;
L.K. Brandt, Physicians
Assistant; and S. Lyngaas,
Reporting Lieutenant,

    Defendants.   Civ. No. 08-6411 (PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Motion of the Defendants Ricardo Rios ("Rios"),

Joyce Anderson ("Anderson"), Chad Mead ("Mead"), Linda Brandt ("Brandt"), and

Scott Lyngaas ("Lyngaas"),[1] to Dismiss, or alternatively, for Summary Judgment. For these purposes, the Plaintiff appears pro se, and the Defendants appear by David W. Fuller, Assistant United States Attorney. For reasons which follow, we recommend that the Defendants' Motion be granted.

## II.  Factual and Procedural Background

The Plaintiff, who is a Federal inmate, is currently designated to the Federal Correctional Institution, in Englewood, Colorado ("FCI-Englewood"), where he is currently serving a 120-month sentence for convictions involving the distribution, receipt, and possession of Child Pornography. See, Declaration of Angela Buege, ("Buege Decl."), Docket No. 19, at ¶3. At all times relevant, the Plaintiff was incarcerated at the Federal Correctional Institution, in Waseca, Minnesota ("FCI-Waseca").[2]

---

[1]The Defendants Dr. James Dey, and Karen Peterson, have already been dismissed from this action, upon the recommendation of the undersigned, by Order of the District Court, the Honorable Paul A. Magnuson presiding, which was dated November 10, 2009. See, Docket No. 30.

[2]The Plaintiff was confined at FCI-Waseca from February 23, 2006, through January 5, 2009, when he was transferred to the Federal Correctional Institution, in Englewood, Colorado. See, Buege Decl. at ¶3.

In this <u>Bivens</u> action, see <u>Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971),[3] the Plaintiff asserts claims against the Defendants, in both their official and individual capacities, for violations of his Eighth Amendment right to be free from cruel and unusual punishment.[4]   The Plaintiff alleges that the

---

[3]In his Complaint, the Plaintiff identified Title 42 U.S.C. §1983 as the basis for his claims.  See, <u>Complaint, Docket No. 1</u>.  Since the Plaintiff is a Federal prisoner, his claims are more properly characterized as <u>Bivens</u> claims.  See, <u>Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).  However, as a practical matter, "[a]n action under <u>Bivens</u> is almost identical to an action under section 1983, except that the former is maintained against federal officials while the latter is against state officials." <u>Christian v. Crawford</u>, 907 F.2d 808, 810 (8th Cir. 1990)[citing cases].   Accordingly, this distinction has had no bearing on our conclusions.

[4]In his two (2) Count Complaint, the Plaintiff has asserted a claim for Cruel and Unusual Punishment under the Eighth Amendment, and a claim for the denial of his right to Due Process under the Fifth and Fourteenth Amendments.  See, <u>Complaint, Docket No. 1</u>, at p. 5 of 9.  In his Due Process claim, the Plaintiff alleges that he was denied access to medical care.  <u>Id.</u>  In construing this claim, we recognize that, because the Plaintiff is a convicted prisoner, his claim for access to adequate medical care is more properly considered under the Eighth Amendment.  See, <u>Thornton v. U.S. Department of Justice</u>, 93 F. Supp.2d 1057, 1064 (D. Minn. 2000)("Challenges to conditions of confinement raised by convicted prisoners arise under the Eighth Amendment's Cruel and Unusual Punishment Clause, while challenges raised by pre-trial detainees arise under the Due Process Clause of the Fourteenth Amendment."), citing <u>Whitnack v. Douglas County</u>, 16 F.3d 954, 957 (8th Cir. 1994), and <u>Spencer v. Knapheide Truck Equip. Co.</u>, 183 F.3d 902, 905 (8th Cir. 1999), cert. denied, 528 U.S. 1157 (2000); see also, <u>Senty-Haugen v. Goodno</u>, 462 F.3d 876, 889-890 (8th Cir. 2006)[citing cases](recognizing that civil detainee's claims fell under the Due Process Clause, rather than the Eighth Amendment, but noting that "the deliberate indifference standard remains applicable."), cert. denied, 549 U.S. 1348 (2007).

Defendants deliberately disregarded his serious medical needs, and denied him access to medical treatment that would prevent unnecessary pain and discomfort, following an injury to the Plaintiff's nose that was sustained during an altercation with another inmate. In particular, the Plaintiff alleges that the Defendants failed to provide him with adequate medical care, by failing to take x-rays of the Plaintiff's nose, by failing to refer him to a specialist for an evaluation, and by failing to recommend him for reconstructive surgery. The Plaintiff further contends that the Defendants completely disregarded his repeated complaints of pain and suffering, and his requests for additional treatment.

For relief, the Plaintiff seeks compensatory damages for pain and suffering; punitive damages; and an injunction requiring the Defendants to provide the Plaintiff with a consultation with an Ear, Nose, and Throat Specialist ("ENT Specialist"), who is independent from the Bureau of Prisons ("BOP"), and requiring the Defendants to follow the specialist's treatment recommendations, including any recommendation for surgery.

On September 28, 2009, the Defendants filed a Motion to Dismiss, or for Summary Judgment. See, Docket No. 17. The Defendants contend that the Plaintiff's official capacity claims are barred by the doctrine of sovereign immunity, that the

Plaintiff failed to exhaust his administrative remedies as to the Defendants Brandt, and Anderson, that the Defendants are entitled to Qualified Immunity, and that the allegations are insufficient to establish a claim for injunctive relief. The Plaintiff has not responded to the Defendants' Motion. The facts, as pertinent to the Motions now before us, may be briefly summarized.

On January 27, 2007, a Correctional Officer informed the Defendant Scott Lyngaas, who was employed as a Lieutenant at FCI-Waseca at the time, that the Plaintiff had reported that he needed medical attention for a broken nose. See, Declaration of Scott Lyngaas, ("Lyngaas Decl."), Docket No. 20, at ¶3. As part of his duties as a Lieutenant, Lyngaas was required to conduct internal investigations of potential violations of BOP rules. Id. at ¶1. The Plaintiff was escorted to the Lieutenant's Office, at which time, he admitted that he had been involved in a fight with another inmate in the cafeteria. Id. at ¶3.

Around this same time, the Plaintiff's injuries were assessed by the Defendant Chad Mead, who is an Emergency Medical Technician ("EMT"), at FCI-Waseca. Id. at ¶4; Declaration of Chad Mead, ("Mead Decl."), Docket No. 21, at ¶¶1-3. Mead avers that he observed that the Plaintiff's "nose was displaced to the left and had some active bleeding." Mead Decl. at ¶3. Mead noted that the Plaintiff was alert and

oriented, and that he had some swelling in his nose, lips, and cheeks. See, <u>Plaintiff's</u> <u>Medical Records, Docket No. 22-1, Attachment A to Declaration of Karen Peterson</u>, at p. 2 of 31. Mead also reported that the Plaintiff had a small laceration on the bridge of his nose. <u>Id.</u>; <u>Mead Decl.</u> at ¶3. Mead directed the Plaintiff to report any life-threatening breathing, or bleeding problems, to BOP staff, and to rest, to apply ice to his nose for the swelling, and to apply pressure to the bridge of his nose, in order to stop the bleeding. <u>Id.</u> Mead also provided the Plaintiff with Ibuprofen for pain relief. <u>Id.</u>

Lyngaas avers that he is not trained, or licensed, as a medical professional, and as a result, that he relied upon Mead to inform him if the Plaintiff required emergency medical care, or additional treatment at a local hospital. See, <u>Lyngaas Decl.</u> at ¶4. Since Mead did not report that the Plaintiff needed to be transported to a local hospital, Lyngaas did not make any arrangements for additional treatment at that time. <u>Id.</u> Lyngaas avers that he did not ignore the Plaintiff's need for medical care, or interfere with any of the treatment that was prescribed by Mead. <u>Id.</u> at ¶¶2-4. The Plaintiff was then admitted to administrative detention in the Special Housing Unit ("SHU"), pending an investigation of any violations of BOP Regulations, that might

have occurred as a result of the Plaintiff's altercation with the other inmate. Id. at ¶¶3-4.

While the Plaintiff was housed in the SHU, his medical condition was assessed on a daily basis. See, Declaration of Karen Peterson, ("Peterson Decl."), Docket No. 22, at ¶3. On January 28, 2007, Mead again examined the Plaintiff, at which time, he observed that there was limited swelling and bruising of the Plaintiff's face, that his nose appeared to be less displaced, and that there was no active bleeding. See, Plaintiff's Medical Records at p. 3 of 31. Mead reported that the Plaintiff had complained of an occasional "tinkle of blood" from his nose, and that he was having some difficulty breathing from his nose. Id. Mead directed the Plaintiff to follow-up with his primary care provider. Id. Following that initial treatment, Mead had no further involvement in the care and treatment of the Plaintiff's nose injury, and he avers that he never had any authority to refer the plaintiff to an ENT specialist, or to assess his need for reconstructive surgery to repair a deviated septum. See, Mead Aff. at ¶¶3-5.

Thereafter, Karen Peterson ("Peterson"), who was formerly a Physician's Assistant at FCI-Waseca, evaluated the Plaintiff's condition on January 29, 2007, at which time, she observed that the Plaintiff "had minimal nasal swelling, a nasal

contusion, and lacerations on his tongue," and she prescribed Tylenol for the pain. See, Peterson Decl. at ¶3; Plaintiff's Medical Records at p. 3 of 31. Peterson saw the Plaintiff, again, on January 30, 2007, at which time, she provided the Plaintiff with Motrin for pain relief at the Plaintiff's request. Id. at p. 4 of 31. Peterson again observed that there was minimal swelling to the nose. Id. Peterson saw the Plaintiff again on February 1, 2007, when the Plaintiff complained that a laceration on his tongue was causing him severe pain. Id. at p. 5 of 31; Peterson Decl. at ¶3. The Plaintiff was instructed to rinse his mouth with a salt water solution four (4) times daily, and to eat softer foods, for relief. Id.

On March 15, 2007, Dr. James Dey ("Dr. Dey"), who was formerly employed as a Medical Doctor at FCI-Waseca, saw the Plaintiff in the chronic care clinic, for an assessment following the Plaintiff's treatment for kidney stones.[5] See, Declaration of James Dey, M.D., ("Dey Decl."), Docket No. 23, at ¶3. During that appointment, Dr. Dey evaluated the Plaintiff's nose condition, and provided the Plaintiff with education about the effects of a broken nose, and nasal septum deviations. Id.; Plaintiff' Medical Records p. 6 of 31. Dr. Dey further avers that he monitored Peterson's care and

_____

[5]The chronic care clinic was monitoring the Plaintiff as a follow-up to his kidney stones, which had been evaluated and treated by specialists employed by the Mayo Clinic. See, Dey Decl. at ¶3 n.1.

treatment of the Plaintiff, during the time period shortly after his injury, and that he did not observe any deficiencies.  See, <u>Dey Decl.</u> at ¶3.          According to Peterson, the Plaintiff made no further complaints regarding his nose injury until September 7, 2007,  when he complained about sinus problems, and nasal congestion, which he attributed to complications from the broken nose.  See, <u>Peterson Decl.</u> at ¶4.[6] In response to his complaints, Peterson assessed his condition on September 10, 2007. <u>Id.</u>; <u>Plaintiff's Medical Records</u> at p. 8 of 31.  Peterson observed that the Plaintiff's nose had septal deviation to the left, that blockage was noted, and that there was "gross deformity."  <u>Id.</u>  Peterson assessed his condition as a probable nasal fracture, and the Plaintiff requested rhinoseptoplasty as a form of treatment.  <u>Id.</u>; <u>Peterson Decl.</u> at ¶4.  Peterson ordered x-rays, in order to determine whether the fracture had caused significant injuries.  <u>Id.</u>  On September 13, 2007, Dr. Dey evaluated the Plaintiff' condition, and found evidence of an upper respiratory infection.  See, <u>Dey Decl.</u> at ¶5. On September 28, 2007, x-rays of the Plaintiff's nose were taken.  See, <u>Peterson Decl.</u> at ¶4.  The x-rays did not reveal any evidence of nasal bone fractures, or facial bone

---

[6]Indeed, the Plaintiff's Medical Records disclose that he was seen by Peterson on June 28, 2007, when he was again evaluated concerning his kidney stones.  See, <u>Plaintiff's Medical Records</u> at p. 6 of 31.  There is no indication that the Plaintiff complained of his nose condition at that time.  <u>Id.</u>

fractures, and the Plaintiff's paranasal sinuses were clear.  Id. at ¶4; Plaintiff's Medical Records at p. 10 of 31.  The x-rays taken on September 28, 2007, revealed some thickening of the nasal turbinates, on the left side of the Plaintiff's nose.  Id.

Shortly thereafter, on October 19, 2007, the Plaintiff was seen by Peterson, in order to discuss the x-rays, and the treatment of the Plaintiff's deviated septum.  See, Plaintiff's Medical Records, at p. 11 of 31.  The Plaintiff again complained of congestion, and he again requested surgery to repair his nasal septum deviation.  Id. at pp. 11-12 of 31; Peterson Decl. at ¶5.  The Plaintiff admitted that he had experienced nasal trauma prior to incarceration, but he denied that it had resulted in a need for medical attention, or gross deformity.  Id.  Peterson determined that the Plaintiff's nasal congestion could be treated with a steroid solution known as Nasalide, and Dr. Dey concurred with that course of treatment.  Id.; Dey Decl. at ¶5.[7] Peterson again ordered x-rays, which did not reveal any nasal bone fractures, or facial bone fractures, and the Plaintiff's paranasal sinuses were clear.  See, Peterson Decl. at ¶¶4-5.  Peterson saw the Plaintiff again, on February 28, 2008, and there is no

_____

[7]Dr. Dey left his position at FCI-Waseca, on January 6, 2008, and accordingly, he had no involvement with the treatment of the Plaintiff's nasal condition, during the remainder of his confinement.  See, Dey Decl. at ¶7.

indication that the Plaintiff voiced any complaints regarding his nasal and sinus issues. See, Plaintiff's Medical Records at p. 14 of 31.

The Plaintiff made no further complaints until March 28, 2008, when he complained of ongoing chronic nasal congestion, chronic sinusitis, shortness of breath, and bleeding in his throat. Id. at p. 16 of 31. At that time, the Plaintiff was referred to Peterson on April 16, 2008. See, Dey Decl. at ¶6. Accordingly, on April 16, 2008, the Plaintiff was seen by Peterson, and they discussed whether the Plaintiff had any existing nasal injuries, or deformity, prior to the fight on January 27, 2007. See, Plaintiff' Medical Records at pp. 17-19 of 31. Peterson avers that the Plaintiff "was evasive and he would not provide complete information on that subject." See Peterson Decl. at ¶5. Although he did acknowledge prior nose injuries, he would not indicate whether he had any prior deformity. See, Plaintiff's Medical Records at p. 17 of 31. Peterson noted that the Plaintiff reported symptoms that included chronic sinus congestion, which disrupted his sleep at times, a raw throat, difficulty clearing mucous, and headaches. Id. at p. 18 of 31.

Peterson also reported that the Plaintiff had used Nasalide for one (1) month, with some improvement, and that the Plaintiff believed that his symptoms were directly related to the injuries he sustained during the altercation. Id. However,

Peterson reported that the Plaintiff had been evaluated on multiple occasions, and that the x-rays had not shown any fractures, and had only shown thickening of the turbinates, on the left side of his nose. Id. Peterson avers that she discussed with the Plaintiff, at length, the possible causes of nasal congestion, which include chronic sinusitis, polyps, and rhinitis, in addition to septal deviation. Id. at p. 19 of 31; Peterson Decl. at ¶5. Peterson directed the Plaintiff to use Nasalide on a daily basis, for relief from his symptoms of congestion, and that he should take antihistamines for further relief, as needed. Id. at ¶5. Peterson advised that they would treat the Plaintiff's symptoms with steroids for three (3) months, and that they would reevaluate the Plaintiff's treatment at that time. See, Plaintiff's Medical Records at p. 19 of 31. Peterson avers that this was her last interaction with the Plaintiff, as her employment with the BOP ended on April 21, 2008. See, Peterson Decl. at ¶5.

With respect to the Plaintiff's nose injury, Peterson further avers, as follows:

> A nasal fracture that causes a deviated septum does not mandate an automatic referral to an ENT specialist for reconstructive surgery and [the Plaintiff's] condition did not require reconstructive surgery during the time that [she] provided treatment for his nose condition.

Id. at ¶7.

Peterson avers that she provided appropriate care while monitoring the Plaintiff's nose injuries at FCI-Waseca. Id. Similarly, Dr. Dey avers that a nasal fracture that causes a deviated septum does not mandate an automatic referral to an ENT specialist for reconstructive surgery. See, Dey Decl. at ¶ 8. Dr. Dey attests that the Plaintiff's condition did not require reconstructive surgery during the time that he assessed the Plaintiff's treatment for his nose condition, and that the care that he provided was appropriate. Id.

The Plaintiff's Medical Records further disclose that, on August 21, 2008, the Plaintiff was seen by Kirk Alford ("Alford"), who is a Registered Nurse, and that he again complained of chronic nasal congestion, chronic sinusitis, an obstructed nasal passage, vacuum sinusitis, post-nasal drip, and headaches. Id. at p. 24 of 31. The Plaintiff requested a CT scan of his nose, and a referral to a specialist. Id. Alford noted that he would follow-up with the Plaintiff's provider, although it is not clear if he took any action. Id.

The Defendant Brandt, who is employed as a Physician's Assistant at FCI-Waseca, has submitted an Affidavit in connection with this Motion, in which she avers that her only involvement with the Plaintiff's medical treatment, while he was incarcerated at FCI-Waseca, occurred on October 7, 2008, when she treated him for

a work-related injury to his finger. See, <u>Declaration of Linda Brandt, ("Brandt Decl."), Docket No. 26</u>, at ¶¶1-3; <u>Plaintiff's Medical Records</u> at pp. 25-26 of 31. According to Brandt, the Plaintiff pierced the tip of his right index finger with a needle while performing sewing work. <u>Brandt Decl.</u> at ¶3. Brandt "removed the needle, applied antibiotic ointment, and applied a band-aid to the wound." <u>Id.</u> Aside from that, Brandt attests that she was never personally involved in the treatment of the Plaintiff' nasal condition, and that she was not aware that a referral to an ENT specialist, or reconstructive surgery, was necessary, given that Dr. Dey, who was aware of the Plaintiff's nasal condition, never requested such treatment. <u>Id.</u> at ¶¶3-5. There is no evidence in the Record that the Plaintiff received, or requested, any further medical care prior to his transfer to FCI-Englewood, in January of 2009.

The Defendant Rios, who is the Warden at FCI-Waseca, is "responsible for the general supervision of all aspects of institutional operations." See, <u>Declaration of Ricardo Rios, ("Rios Decl."), Docket No. 24</u>, at ¶1. Rios avers that, on December 6, 2007, the Plaintiff filed an inmate administrative remedy request, in which he claimed that he had a deviated nasal septum, which required evaluation and treatment by a specialist. <u>Id.</u> at ¶3. On December 20, 2007, Rios denied the request for additional evaluation and treatment of the Plaintiff's deviated septum condition, because his

condition was promptly evaluated, and because x-rays obtained on September 28, 2007, and November 23, 2007, revealed no fractures, and clear paranasal sinuses. <u>Id.</u> According to Rios, the Plaintiff appealed his decision to the Regional Director, and to the General Counsel of the BOP, which denied his appeals because his condition was appropriately assessed, and because there was no need for additional evaluation or treatment by a specialist. <u>Id.</u>

Rios further acknowledges that, on February 25, 2008, the Plaintiff's paternal grandmother wrote a letter to Michael Nalley ("Nalley"), who is the North Central Office Regional Director, complaining that Rios had refused to provide medical care and attention to the Plaintiff's deviated septum condition. <u>Id.</u> at ¶4. The Plaintiff's grandmother asked Nalley to "overturn" Rios's denial of specialized medical care and treatment for the Plaintiff's condition. <u>Id.</u> In response, on March 14, 2008, Rios informed the Plaintiff's grandmother that the Plaintiff's "condition had been evaluated, x-rays did not reveal any evidence of a fracture, x-rays revealed clear paranasal sinuses and no further treatment was warranted based on assessments by the medical professionals employed at FCI Waseca." <u>Id.</u>[8]

_____

[8]The Plaintiff has alleged that on March 15, 2008, he informed Rios of the "lack of medical attention by medical professionals," and that Rios ignored his report. See, <u>Rios Decl.</u>, supra at ¶2. Rios does not recall any details of the asserted conversation

According to Rios, he is not a licensed, trained medical professional, and as a consequence, he relies upon the facility's medical professionals to provide the proper care and treatment for an inmate's medical needs. <u>Id.</u> at ¶5. Rios avers that he was never informed by any medical professional employed at FCI-Waseca, that the Plaintiff required additional evaluation or treatment by a specialist. <u>Id.</u>

The Defendant Anderson serves as the Health Systems Administrator at FCI-Waseca, where she is responsible for overseeing the operations of the Health Services Department. See, <u>Declaration of Joyce Anderson, ("Anderson Decl."), Docket No. 25</u>, at ¶1. Anderson avers that she was never aware of a serious risk of harm to the Plaintiff, in connection with his nasal condition, nor was she aware that he was in need of reconstructive surgery, or a referral to an ENT specialist. <u>Id.</u> at ¶3. Anderson avers that the Plaintiff's condition was extensively evaluated while he was incarcerated at FCI-Waseca, and that Dr. Dey never ordered a consultation with an ENT specialist. <u>Id.</u>

The Plaintiff's medical records reveal that he is not receiving any current treatment for nasal congestion at FCI-Englewood, and that there are no plans for the Plaintiff to see an ENT specialist. See, <u>Dey Decl.</u> at ¶7; <u>Peterson Decl.</u> at ¶6. In

_____

with the Plaintiff. <u>Id.</u> at ¶3.

addition, entries in his medical records establish that, while at FCI-Englewood, the Plaintiff complained of depression and obsessive compulsive disorder, in order to obtain medications for those problems. See, <u>Mead Decl.</u> at ¶4. However, he eventually acknowledged that he did not have those conditions, and that he did not want medication for the treatment of those conditions. <u>Id.</u>; <u>Brandt Decl.</u> at ¶4.

With the foregoing factual and procedural backdrop, we turn to consider the merit of the Defendants' Motion.

## III.  <u>Discussion</u>

The Defendants seek Summary Judgment on the Plaintiff's official capacity claims on the grounds that they are barred by the doctrine of sovereign immunity. The Defendants also contend that they are entitled to qualified immunity because the Plaintiff has failed to demonstrate a violation of his constitutional rights. Lastly, the Defendants argue that the Plaintiff has failed to establish grounds for injunctive relief. We commence our discussion with the Defendants' threshold contention, that the Plaintiff's official capacity claims fail by virtue of sovereign immunity.[9]

---

[9]Anderson and Brandt also contend that the Plaintiff's claims against them should be dismissed for failure to exhaust administrative remedies. However, given our conclusion that the Plaintiff has failed to demonstrate a violation of his constitutional rights, with respect to any of the named Defendants, we need not address that argument further.

A. <u>Sovereign Immunity</u>. At the outset of our analysis, we note that, as a sovereign power, the United States may be sued only to the extent that it has consented to suit by Statute. <u>United States Dept. of Energy v. Ohio</u>, 503 U.S. 607, 615 (1992); <u>United States v. Mitchell</u>, 445 U.S. 535, 538 (1980). "Sovereign immunity is a jurisdictional doctrine, and the terms of the United States' 'consent to be sued in any court define that court's jurisdiction to entertain the suit.'" <u>Brown v. United States</u>, 151 F.3d 800, 803-804 (8th Cir. 1998), quoting <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994); see also, <u>United States v. Mottaz</u>, 476 U.S. 834, 841 (1986) ("When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction."), citing <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941).

Waivers of sovereign immunity must be strictly construed in favor of the sovereign, and may not be enlarged beyond what the language of the waiver requires. <u>United States v. Nordic Village, Inc.</u>, 503 U.S. 30, 34 (1992); see also, <u>Bowen v. City of New York</u>, 476 U.S. 467, 479 (1986); <u>Block v. North Dakota</u>, 461 U.S. 273, 287 (1983). Thus, the doctrine of sovereign immunity holds that the United States, and its agencies and instrumentalities -- including the Federal Bureau of Prisons ("BOP") -- are immune from suit, unless a waiver of such immunity has been "expressed

unequivocally" by Congress.  Manypenny v. United States, 948 F.2d 1057, 1063 (8th Cir. 1991); United States v. Dalm, 494 U.S. 596, 608 (1990); United States v. Mitchell, supra at 538; Kaffenberger v. United States, 314 F.3d 944, 950 (8th Cir. 2003).

Congress has not waived the sovereign immunity of the United States Government, or its agencies, for claims that their employees have violated the Constitution.  See, Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics, supra at 410; Searcy v. Donelson, 204 F.3d 797, 798 (8th Cir. 2000), cert. denied, 531 U.S. 898 (2001); Buford v. Runyon, 160 F.3d 1199, 1203 (8th Cir. 1998)("It is well settled that a Bivens action cannot be prosecuted against the United States and its agencies because of sovereign immunity.").  A Federal prisoner, in a BOP facility, may bring a Bivens claim against an individual officer, subject to the defense of qualified immunity, but "[t]he prisoner may not bring a Bivens claim against the officer's employer, the United States, or the BOP * * * [since] his only remedy lies against the individual," with respect to the alleged constitutional deprivation.  Correctional Services Corp. v. Malesko, 534 U.S. 61, 72 (2001); see also, Buford v. Runyon, supra at 1203.

Accordingly, to the extent that the Plaintiff sues the Defendants in their official capacities, the United States is the real party in interest, and sovereign immunity bars those claims. See, Kentucky v. Graham, 473 U.S. 159, 166 (1985)(suits against public officials acting in their official capacities should be treated as suits against the public entity); Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006)("A suit against a public officer in his official capacity is actually a suit against the entity for which the official is an agent."). Therefore, we recommend that the Plaintiff's claims against the Defendants, in their official capacities, be dismissed for lack of subject matter jurisdiction, leaving only the individual capacity claims.

      B.     Individual Capacity Claims.

      1.     Standard of Review. Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006), citing Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those

facts, in a light most favorable to the nonmoving party, and we have found no triable issue.  See, <u>Smutka v. City of Hutchinson</u>, 451 F.3d 522, 526 (8th Cir. 2006), citing <u>Mayer v. Nextel W. Corp.</u>, 318 F.3d 803, 806 (8th Cir. 2003), cert. denied, 540 U.S. 823 (2003); <u>Eide v. Grey Fox Technical Servs. Corp.</u>, 329 F.3d 600, 604 (8th Cir. 2003); <u>Philip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 (8th Cir. 2003).

For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party.  See, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Planned Parenthood of Minnesota/South Dakota v. Rounds</u>, 372 F.3d 969, 972 (8th Cir. 2004); <u>Fenney v. Dakota, Minnesota & Eastern R.R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute.  In sustaining that burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  <u>Rule 56(e), Federal Rules of Civil Procedure</u>; see also, <u>Anderson v. Liberty Lobby, Inc.</u>, supra at 256; <u>Eddings v. City of Hot Springs, Ark.</u>, 323 F.3d 596, 602 (8th

Cir. 2003).   Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).[10]

_____

[10]Here, the Defendants have couched their Motion as one to Dismiss, or for Summary Judgment.   However, because we have relied upon matters outside the pleadings in ruling on the Defendants' Motion, we have analyzed the Motion under the framework of Rule 56, rather than under the regimen of Rule 12.  The Plaintiff had notice that both Motions were being pursued, alternatively, and yet has failed to file any response in opposition to the dispositive Motions.

2.     Legal Analysis.

a)     Standard of Review.   Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  See, Wilson v. Layne, 526 U.S. 603, 609 (1999); Young v. Harrison, 284 F.3d 863, 866 (8th Cir. 2002); Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken.'"   Wilson v. Layne, supra at 614, quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987); Parrish v. Ball, 594 F.3d 993, 1001(8th Cir. 2010).   The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful * * * ; but it is to say that in light of pre-existing law, the unlawfulness must be apparent."  Anderson v. Creighton, supra at 640 [citations omitted]; Nelson v.

Correctional Medical Services, 583 F.3d 522, 531 (8th Cir. 2009); Young v. Selk, 508 F.3d 868, 875 (8th Cir. 2007). Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996), quoting Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995), quoting, in turn, Malley v. Briggs, 475 U.S. 335, 343 (1986).

"In analyzing the officials' claim of qualified immunity we consider two questions: (1) 'whether the facts that a plaintiff has alleged or shown,' when viewed in the light most favorable to [the plaintiff], support a finding that the conduct of [the defendants] violated a constitutional right, and (2) whether that constitutional right was 'clearly established' [at the time of the alleged violation] such that a reasonable official would have known that his or her actions were unlawful." Nelson v. Correctional Medical Services, supra at 528, quoting Pearson v. Callahan, --- U.S. ---, 129 S.Ct. 808, 815-16 (2009); see also, Howard v. Kansas City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009).

"Recently, the Supreme Court instructed that we are 'permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case

- 24 -

at hand." Parrish v. Ball, supra at 1001, quoting Pearson v. Callahan, supra at 818.

While advising that the Saucier procedure is helpful, see, Saucier v. Katz, 533 U.S.

194 (2001), but no longer mandatory, the Supreme Court explained, as follows:

> [T]he rigid Saucier procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right. District courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise.

Pearson v. Callahan, supra at 818.

As a result, where appropriate, Courts are permitted to dispose of the qualified

immunity issue on the second prong -- that is, whether a constitutional right is clearly

established -- without considering the first prong of the Saucier inquiry. See, Parrish

v. Ball, supra at 1002-1003 (holding that the second prong was dispositive, because

the defendant's actions did not amount to a violation of a clearly established

constitutional right); Norman v. Schuetzle, 585 F.3d 1097, 1103 (8th Cir. 2009).

      b)    Legal Analysis.    In this case, the Defendants contend that

they are entitled to qualified immunity because the facts do not establish a violation

of the Plaintiff's clearly established constitutional rights. We agree.

- 25 -

I)    The Plaintiff's Eighth Amendment Claims. It is well-established that deliberate indifference to a prisoner's serious medical needs is prohibited by the Eighth Amendment. See, Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006). "A prisoner's Eighth Amendment rights are violated if prison officials show 'deliberate indifference' to the prisoner's 'serious medical needs.'" Olson v. Bloomberg, 339 F.3d 730, 735 (8th Cir. 2003), quoting Estelle v. Gamble, supra at 106. Eighth Amendment claims have both an "objective" and a "subjective" component, and accordingly, to prevail on a claim of constitutionally inadequate medical care, an inmate must "demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997), citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); Crow v. Montgomery, 403 F.3d 598, 602 (8th Cir. 2005); Pagels v. Morrison, 335 F.3d 736, 740 (8th Cir. 2003); Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001).

"Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." Meloy v.

- 26 -

Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002). However, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000), quoting Estate of Rosenburg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); see also, Smith v. Clarke, 458 F.3d 720, 724 (8th Cir. 2006); Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir. 1999)("'Mere negligence or medical malpractice * * * are insufficient to rise to a constitutional violation.'"), quoting Dulaney v. Carnahan, supra at 1239; DeGidio v. Pung, 920 F.2d 525, 532 (8th Cir. 1990)("[T]he eighth amendment does not transform medical malpractice into a constitutional claim."). A serious medical need is one that has been "diagnosed by a physician as requiring treatment, or * * * [is] so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991); see also, Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006); Jones v. Minnesota Dept of Corrections, 512 F.3d 478, 481 (8th Cir. 2008); Grayson v. Ross, 454 F.3d 802, 808-09 (8th Cir. 2006).

Accordingly, our initial inquiry focuses on whether the Plaintiff suffered from an objectively serious medical need, and whether the Defendants knew of, but

deliberately disregarded that need.  See, <u>Jolly v. Knudsen</u>, supra at 1096.  We find that they did not.

Aside from the Plaintiff's bare allegations, there is simply no evidence in this Record, that **any of the Defendants** deliberately disregarded the Plaintiff's serious medical needs.  From the date of his injury, on January 27, 2007, until his transfer out of FCI-Waseca, the Plaintiff was treated on several occasions for complaints related to his nose injury, sinus problems, and nasal congestion.  During the course of his treatment, the Defendants took a number of actions in response to his complaints, and the Plaintiff has failed to show that any of those actions were constitutionally inadequate, or that any serious risk of harm to the Plaintiff was consciously disregarded by any of the Defendants.[11]

---

[11]As noted, the Plaintiff has not responded to the Defendants' pending Motion, nor has he provided any statement, declaration, or affidavit, which would qualify as competent evidence, for purposes of Summary Judgment.  Cf., <u>Hill v. Kansas City Metro Task Force</u>, 182 Fed.Appx. 620, 621-622 (8th Cir. 2006)(holding that prisoner raised genuine issue of material fact where his statements were subscribed to as true under penalty of perjury), citing <u>Title 28 U.S.C. §1746</u> (providing that where a matter must be supported or evidenced by a sworn declaration, statement or affidavit, "such matter may, with like force and effect, be supported, evidence, established, or proved by the unsworn declaration * * * or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated[.]"); <u>Roberson v. Hayti Police Dep't</u>, 241 F.3d 992, 994-95 (8th Cir. 2001)("Although a party may not generally rest on his pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a

First, with respect to Lyngaas and Mead, who were involved in the Plaintiff's initial treatment shortly after he sustained the injury to his nose, the Plaintiff alleges that they were deliberately indifferent to his "obvious need for medical care * * * [and] complaint of a broken nose." Complaint, supra at pp. 2 and 4 of 9. We understand the Plaintiff to allege that he was denied access to medical treatment by Lyngaas and Mead, immediately following the altercation resulting in his injuries, because Mead merely examined the Plaintiff's injuries through the cell door, because he failed to "feel" the Plaintiff's nose for a fracture, and because he denied the Plaintiff's request for additional medical care at a local hospital. However, we find that the undisputed facts establish that neither Mead, nor Lyngaas, was deliberately

---

responsive affidavit in order to survive a summary judgment motion.").

"While on summary judgment, a nonmoving party is entitled to a favorable view of the evidentiary record, the party must substantiate its allegations with sufficiently probative evidence to avoid an adverse judgment." Cody v. Weber, 256 F.3d 764, 772 (8th Cir. 2001), citing Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994). Moreover, pro se litigants are not excused from complying with the Federal Rules of Civil Procedure. See, Carmen v. Treat, 7 F.3d 1379, 1381 (8th Cir. 1993). Accordingly, while we have viewed the evidence liberally, and in the Plaintiff's favor, we cannot assume the existence of evidence which is not in the Record. Here, the Plaintiff has failed to make any showing in support of his bare allegations.

indifferent to the Plaintiff's serious medical needs, at the time he initially sustained the injury.

It is undisputed that the Plaintiff's nose was treated shortly after the incident by Mead, who provided the Plaintiff with basic first aid. The Record reveals that the swelling in his nose was treated with ice, and that he was directed to apply pressure to the bridge of his nose, in order to stop the bleeding. Mead also gave the Plaintiff Ibuprofen to relieve the pain, and he directed the Plaintiff to notify BOP staff if any life-threatening breathing or bleeding problems arose. The Plaintiff has not offered any evidence suggesting that he never actually received that treatment, and he has not otherwise shown that the course of treatment was constitutionally inadequate, or resulted in a worsening of his condition, or any additional harm. Moreover, there is no evidence that Lyngaas denied the Plaintiff access to medical care, since he did not prevent Mead from examining or treating the Plaintiff, and he did not interfere with Mead's prescribed course of treatment. While the Plaintiff may have wished to go to a hospital, there is no indication that treatment at a local hospital was necessary, or that such treatment would have been beneficial to the Plaintiff's condition.

Moreover, in the days following the initial injury, the Plaintiff was provided with pain relievers, and he was instructed to eat soft foods and to rinse his mouth with

a salt water solution, following complaints of a laceration to his tongue. After February 2, 2007, however, the Plaintiff did not seek treatment from, or complain to, any of the Defendants, regarding his nasal condition until September of 2007.[12] The Plaintiff's nose was x-rayed on two (2) occasions, which did not reveal a fracture, or any other serious problems with the Plaintiff's nose. The Plaintiff was then advised to commence steroid treatment for his congestion problems -- a treatment that he terminated, on his own initiative, after only one (1) month. When the Plaintiff complained again, in March of 2008, he was again advised to treat his symptoms with the steroid spray, along with antihistamines, as needed. Given the evidence in the Record, a reasonable Juror could not conclude that any of the Defendants deliberately disregarded the Plaintiff's serious medical needs.

Rather, the Plaintiff's chief complaint relates to the Defendants' conservative course of treatment in responding to his nasal condition. First, the Plaintiff objects to the Defendants' delay in ordering x-rays of his nose, since x-rays were not taken of

---

[12]We recognize that the Plaintiff was seen by Dr. Dey on March 15, 2007, for a follow-up evaluation, which was related to his treatment for kidney stones. At that time, Dr. Dey educated the Plaintiff on the effects of a broken nose, and a septal deviation. Even if we assume that the Plaintiff complained of pain and suffering at that time, there is no evidence that any of the Defendants were made aware of those complaints, or were aware of Dr. Dey's failure to respond to those complaints, in March of 2007.

his nose until more than seven (7) months after he first sustained the injury in question. However, "when the inmate alleges that the delay in treatment is the constitutional deprivation, the objective seriousness of the deprivation should also be measured 'by reference to the **effect** of delay in treatment.'" Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)[emphasis in original], quoting Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled on other grounds, Hope v. Pelzer, 536 U.S. 730, 739 (2002); Dulany v. Carnahan, supra at 1243("The objective portion of the deliberate indifference standard requires a showing of 'verifying medical evidence' that * * * delays adversely affected the [plaintiff's] prognosis given the type of injury in [the] case.")[citations omitted]; Coleman v. Rahija, supra at 784.

"In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." Dulany, supra at 1240; Meuir v. Greene Count Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007)(the plaintiff had failed to produce any evidence to support his claim that his treatment was constitutionally inadequate, while the defendants had

provided evidence attesting to the adequacy of the treatment, and accordingly, Summary Judgment in favor of the defendants was proper).

Here, the Plaintiff has not established that there was any need for x-rays either immediately after his injuries, or in the following months. At best, the evidence even fails to reflect that the Defendants were negligent, in failing to fully assess the Plaintiff's condition by obtaining x-rays at the outset. Most importantly, the Plaintiff has failed to provide any evidence of any detrimental effects from the asserted delay in obtaining x-rays of his nose. Indeed, the Record discloses that, even after the Plaintiff's nose was x-rayed, there was no evidence of a fracture, or any other serious problem in the structure of his nose, nor did the x-rays reveal any serious medical condition, which needed medical treatment. See, Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005)("While [the plaintiff] submitted evidence documenting his diagnosis and treatment, he offered no evidence establishing that any delay in treatment had a detrimental effect and thus failed to raise a genuine issue of fact on an essential element of his claim), cert. denied, 549 U.S. 927 (2006); Dowty v. Tarrell, 368 F. Supp.2d 1024, 1027 (D. S.D. 2005) ("Because [the plaintiff] has cited no evidence that the delay harmed him, and the defendants have evidence that it did not harm him, a reasonable jury could not find for [the plaintiff]."); Sherrer v. Stephens,

50 F.3d 496, 496-497 (8th Cir. 1994) (concluding that the evidence was insufficient where treatment for a broken finger was delayed, but ice, painkillers, and x-rays, were eventually prescribed, and there was no evidence that the delay adversely affected the plaintiff's prognosis); cf., <u>Gordon v. Frank</u>, 454 F.3d 858, 862-64 (8th Cir. 2006)(concluding that prison officials violated an inmate's Eighth Amendment rights, by delaying medical treatment, where the officials had knowledge that the inmate was at a high risk of heart failure, and was exhibiting symptoms of heart failure, and where the delay resulted in the inmate's death). Here, the Plaintiff obviously disagrees with the Defendants' initial decision not to seek more aggressive medical care for his nose injury -- and particularly, their failure to obtain x-rays at the outset. However, not only is there no evidence that the Defendants were unreasonable in failing to x-ray the Plaintiff's nose, but there is also no evidence that the asserted delay caused any harm to the Plaintiff.

Next, the Plaintiff challenges the Defendants' failure to refer him to an ENT specialist, and to recommend him for reconstructive surgery, as he had requested. However, it is well-established that an inmate's disagreement with his course of treatment does not establish a cognizable Eighth Amendment claim. See, <u>Smith v. Marcantonio</u>, 910 F.2d 500, 502 (8th Cir. 1990)(inmate failed to establish deliberate

indifference where his complaints represented nothing more than mere disagreement with the course of his medical treatment); Bender v. Regier, 385 F.3d 1133, 1137 (8th Cir. 2004); Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)(Prison medical personnel are entitled to exercise their medical judgment, and accordingly, it is well-established that they "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment."); Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008); Pietrafeso v. Lawrence County, 452 F.3d 978, 983 (8th Cir. 2006).

Of course, "a claim of deliberate indifference is not defeated merely by showing that a physician diagnosed or treated a prisoner * * * since '[g]rossly incompetent or inadequate medical care can constitute deliberate indifference.'" Marlin v. Jimenez, 2006 WL 2547465 at *18 (E.D. Ark., August 31, 2006), aff'd, 282 F.3d.Appx. 503 (8th Cir. 2008), quoting Warren v. Fanning, 950 F.2d 1370, 1373 (8th Cir. 1991), cert. denied, 506 U.S. 836 (1992). However, in this case, there is no evidence that any of the medical care was inadequate, since there was no indication that the Plaintiff had a serious medical need for his requested course of treatment. See, Bender v. Regier, supra at 1137 ("[T]hough an [Hepatitis C virus] infection is unquestionably a serious medical problem, the Eighth Amendment issue is not whether the infection itself is a

'serious medical need,' but rather whether [the plaintiff] had a serious medical need for prompt interferon treatment."). Both Peterson and Dey, who were primarily responsible for denying the Plaintiff's requested treatment, have attested to the fact that the Plaintiff's medical treatment was adequate, and that he was not in need of reconstructive surgery, or an ENT specialist referral. As we have detailed, the Plaintiff has not competently disputed, let alone rebutted, that evidence, and accordingly, we conclude that the Plaintiff's disagreement with the prison's course of treatment is insufficient to establish an Eighth Amendment claim.

On a final note, we further conclude that the Plaintiff has failed to establish any plausible basis for holding the remainder of the Defendants liable for any asserted Eighth Amendment violations. First, with respect to Brandt, the Record discloses that she was never involved in the Plaintiff's treatment for his nose condition, and the Plaintiff has failed to proffer any evidence that she ever disregarded a serious risk of harm to the Plaintiff's health.

Moreover, we find that Anderson and Rios were only involved in the Plaintiff's treatment in a supervisory capacity. A supervisor "is only liable 'for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward

the violation.'" Meloy v. Bachmeier, supra at 849 (supervisor, who had some medical training as a nurse, did not violate the defendant's Eighth Amendment rights in relying upon the opinion of the treating physicians, and in failing to override or second-guess their treatment decisions),  quoting Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). "A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions," and additionally, "[p]rison officials cannot substitute their judgment for a medical professional's prescription." Meloy v. Bachmeier, supra at 849 , citing Camberos v. Brandstad, 73 F.3d 174, 176 (8th Cir. 1995), and Zentmyer v. Kendall County, 220 F.3d 805, 812 (7th Cir. 2000).  There is no evidence that either Rios or Anderson were made aware that any of the Plaintiff's health care providers were deliberately disregarding a serious medical need.

The medical staff advised them, as supervisors, that a consultation with a specialist and reconstructive surgery were unnecessary, and there is no evidence that they had any reason to believe that that determination was a violation of the Plaintiff's rights.  Moreover, there is nothing in the Record to establish that the Plaintiff's need for reconstructive surgery, or for a consultation with a specialist, was so obvious, that either Anderson or Rios should have understood that the prison's medical staff were consciously disregarding the Plaintiff's constitutional rights.  As a consequence, they

were justified in relying upon the medical staff's treatment decisions, and we find no basis for concluding that they were deliberately indifferent to the Plaintiff's medical needs in relying on those decisions.

In sum, there is no evidence in the Record to establish a finding that the Plaintiff's medical care was "so inappropriate as to evidence intentional maltreatment." Jolly v. Knudsen, supra at 1097, quoting Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990). The evidence, at best, demonstrates that prison officials adopted a conservative course of treatment, which the Plaintiff has failed to show was deliberately indifferent to his medical needs. See, Logan v. Clarke, 119 F.3d 647, 649-50 (8th Cir. 1997)(Where prison doctors treated inmate on numerous occasions and offered him a variety of pain killers, prison doctors were not deliberately indifferent.); Camberos v. Branstad, supra (Prison nurses were not deliberately indifferent because they chronicled the inmate's numerous medical complaints, often referred him to a physician's assistant, and sent him to an outside hospital seven (7) times for further treatment); Long v. Nix, supra at 765 (Inmates do not have constitutional right to particular type of treatment; nothing in Eighth Amendment prevents prison doctors from exercising independent medical judgment.); Proctor v. Kelley, 2010 WL 1433458 at *7 (E.D. Ark., February 24, 2010)("While Plaintiff is

clearly dissatisfied with the level of care provided, and may truly believe that surgery is the only option, as a matter of law, Plaintiff's claims fail to support a finding that he has been denied medical care," but rather, "the record shows a disagreement with the medical professionals about his needs."), adopted by, 2010 WL 1433462 (April 9, 2010). Since the Plaintiff has failed to raise a genuine issue of material fact that the Defendants violated his Eighth Amendment rights, we recommend that the Defendants' Motion be granted, and that the Complaint be dismissed.

C.    Injunctive Relief.

Lastly, the Plaintiff seeks injunctive relief that directs the Defendants to provide the Plaintiff with a consultation with an ENT specialist who is not affiliated with the BOP, and that directs them to follow any treatment recommended by that specialist, including any recommendation for surgery. In order to obtain injunctive relief, the Plaintiff must establish success on the merits. See, Randolph v. Rodgers, 170 F.3d 850, 857 (8th Cir. 1999), citing Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12 (1987); Vonage Holdings Corp. v. Minnesota Public Utilities Com'n, 290 F. Supp.2d 993, 996 (D. Minn. 2003); Oglala Sioux Tribe v. C & W Enterprises, Inc., 542 F.3d 224, 229 (8th Cir. 2008). As we have already detailed, the Plaintiff cannot succeed on the merits, and therefore, the Plaintiff has not asserted a

viable claim for injunctive relief, and Summary Judgment should be granted in favor of the Defendants on the Plaintiff's claim for injunctive relief, as well.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendants' Motion for Summary Judgment [Docket No. 17] be GRANTED.

2.     That this action be DISMISSED WITH PREJUDICE.


Dated: July 16, 2010                                     _s/Raymond L. Erickson_
                                                         Raymond L. Erickson
                                                         CHIEF U.S. MAGISTRATE JUDGE


# N O T I C E

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than July 30, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this

procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than July 30, 2010**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.